*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHALK SUPPLY LLC, doing business as WEST MICHIGAN FINISHES,

Plaintiff-Counter Defendant-
Appellee,

v

RIBBE REAL ESTATE LLC,

Defendant-Counter Plaintiff-
Appellant.

UNPUBLISHED
January 2, 2020

No. 345805
Muskegon Circuit Court
LC No. 16-005515-CK

Before: METER, P.J., and O'BRIEN and TUKEL, JJ.

PER CURIAM.

Following a bench trial, the trial court entered judgment in favor of plaintiff, Chalk Supply LLC, doing business as West Michigan Finishes (Chalk Supply), against defendant, Ribbe Real Estate LLC (RRE), on Chalk Supply's breach of contract claim. RRE appeals as of right. Finding no merit to RRE's claims of errors, we affirm.

## I. FACTS

This case arises from a contract dispute between RRE and Chalk Supply. Scott Ribbe ran two companies that either he or his wife owned: Ribbe owned Geerpes, which sold cleaning products, and Ribbe's wife owned RRE, which owned the warehouse Geerpes rented. This opinion will refer to that warehouse as "the Geerpes building." Jacob Nash, the owner of Chalk Supply, testified that Chalk Supply buys "large quantities of paints, stains, lacquers, glues aerosols, tools, all of the above," repackages them into smaller quantities, warehouses those products, and ultimately sells those products to "like a retail customer." RRE advertised to lease space in the Geerpes building, and eventually Chalk Supply got in contact with RRE to discuss a possible lease. The parties signed a lease in which RRE agreed to lease Chalk Supply a portion of the Geerpes building for 18 months. Pertinent to this appeal, the lease contained the following provision:

11. _Fire Suppression_. In the event that local ordinance requires fire suppression, Tenant and Landlord agree that the installed cost of the suppression system will be divided by 84 months (7 years) of which Tenant will pay in like equal installments during the term of the lease and any renewals or extensions thereof, including prepayment at the onset of this lease term.

Both Nash and Ribbe testified that this provision was not in the original draft of the lease, but rather was added to a later draft at Nash's request, and was included in the final agreement.

The parties disagreed over when Nash told Ribbe that the materials that he intended to store in the Geerpes building may require fire suppression. Ribbe said that Nash told him the first time that Nash saw the building, during their "initial discussion," that fire suppression would not be required to store his goods. Nash, on the other hand, testified that he discussed his products with Ribbe before signing the lease and never told Ribbe that fire suppression would not be needed. A former employee of Chalk Supply, Daniel Begue, testified that he was present at "the first introduction" between Ribbe and Nash. According to Begue, "[t]he issue of fire suppression began on the first day that [he] met with Mr. Ribbe" because he "was looking at the ceiling and [he] didn't see any fire suppression, so [he] confirmed with him that it wasn't suppressed."

Mark Nicolai is the fire inspector for the Muskegon Township Fire Department. When Nicolai learned that RRE was planning to rent the Geerpes building to Chalk Supply, he got into contact with Ribbe and Nash. Chalk Supply submitted to Nicolai a sheet listing all of the products that it intended to store at the warehouse. Based on the listed materials, Nicolai determined that Chalk Supply intended to store "a significant amount of flammable and combustible liquids," which "require[d] suppression."

Lorraine Grabinski, who at all relevant times was the planning and development director for Muskegon Township, testified that based on the zoning of the Geerpes building, a "special use permit" was required for RRE to rent the building to anyone, including Chalk Supply. To obtain a special use permit, an applicant was required to submit an application to the Township. That application would first go to the planning commission, who would give a recommendation to the Township board to either approve or deny the application. The Township board would then make the final decision on approval of the permit. Grabinski testified that she received a special use permit application from Nash, signed by Ribbe "as the property owner," on February 11, 2016. According to Grabinski, following a meeting, the planning commission recommended approval to the Township board, but the board did not want the special use permit on its agenda "until they had prints showing the fire suppression" because "the fire inspector had determined fire suppression was needed . . . ."

Nicolai explained that the local ordinance left to his discretion what would be acceptable to meet the fire code. Nicolai testified that at the planning commission meeting, he told the parties that based on the list of materials that were to be stored at the warehouse, fire suppression was going to be required. During trial, the following exchange occurred between Nicolai and the trial court:

*The Court.* Mr. Nicolai, let me plunge right into the thicket here. Is fire suppression installation required by local ordinance for this job?

*The Witness.* Based on the quantities that they submitted that they were going to have, yes. I found that it turned them into a H classification which required suppression.

*The Court.* All right. So from everything you knew about this job, in your view it is required by local ordinance?

*The Witness.* Yes.

When asked if fire suppression was required, Nicolai testified, "Initially, yes."

On March 25, 2016—which was 11 days after the planning commission meeting—Ribbe sent Nash the following e-mail:

An update. I received a quote on fire suppression for over $65,000. As such, I wanted you to be aware that if required, we will need to review the lease tenure as I will not be willing to invest another $65k into an 18 month lease at this juncture. Frankly, I did not plan on additional doors, egress or fire, automatic closing doors and that related cost. I know your intention is to avoid the suppression, but felt to advise where I am at.

Ribbe testified that in his March 25 e-mail, he was stating that RRE was not willing to pay the $65,000 for the fire suppression system unless the parties renegotiated the lease. Ribbe explained that there was "some impracticality" to investing another $65,000 for an 18 ½ month lease, and that there was "a big credit risk" as well. Ribbe denied that his March 25 email said that "even if [fire suppression] were required [RRE wasn't] going to pay it." But he then immediately testified that he meant if fire suppression were required, the parties would "need to review the lease" and "get this thing—thing modified . . . ." Ribbe later repeated that paying $65,000 "for [Chalk Supply] to have an 18 month lease [was] completely impractical," and RRE would only pay it "subject to some discussion about the tenure of the lease."

Nash testified that he interpreted Ribbe's March 25 e-mail somewhat differently. Nash did not "price out" the cost of fire suppression because Ribbe had done so and had sent Nash the e-mail with the quote from a "fire suppression company." Nash testified that he had "an oral conversation" with Ribbe where Ribbe expressed that he had a problem with the $65,000 quote, and so the March 25th e-mail did not come as a surprise to Nash because it was confirming what Ribbe had already told him. Begue testified that he had a similar conversation with Ribbe about the $65,000 quote where Ribbe told Begue, " 'I'm not doing it,' " and " 'I'm just not going to do that.' " Begue told this to Nash, and Nash told Begue that he had already had a similar conversation with Ribbe. Nash testified that there were no negotiations about the price of fire suppression, Ribbe "just said he wasn't going to do it." Nash testified that when Ribbe said this, Nash was still willing to pay for fire suppression under the agreed-upon payment plan of 84 months.

-3-

Nash explained that at no time before or after the March 25 e-mail did Ribbe offer an alternative to fire suppression. But, according to Nash, he was still "willing to try to figure something else out," and he spoke to Nicolai about possible alternatives. Nash testified that Nicolai mentioned the possibility of a fire containment option, also referred to as "a room within a room." Nicolai contradicted this; he said that the fire containment idea came from an architect hired by Nash, Brock Hesselsweet. According to Nicolai, he told the parties that fire suppression was required before meeting with Hesselsweet, but when the parties asked him if fire containment would satisfy the fire code requirements, he said that it would. Nicolai agreed that if the parties chose to employ this "room within a room" or fire containment approach, then fire suppression was not required by the ordinance.

Nicolai said that "room within a room" fire containment was when there were "control rooms." He explained:

> A control room, it has to be fire rated, meaning it has to be based on the product that they're—they're trying to keep them fire spread or fire danger would be fire rated based on that. And depending on what the product is, there are again max allowable quantities of certain products within a [sic] area.

Nicolai testified that, based on the square footage of the Geerpes building, a maximum of only four control rooms was allowed, each with a limit of 60 gallons per room.

Nash testified that he hired Hesselsweet, an architect, to explore the "room within a room" option. According to Nash, Hesselsweet eventually told Nash that a room-within-a-room option was not realistic with Chalk Supply's "quantities," presumably meaning amount of flammable and combustible products. Nash testified that Chalk Supply carried between 1,200 and 1,500 gallons of combustible and flammable products, and Chalk Supply would not be able to store those quantities if the parties used fire containment. Nash testified that, after he found out that the room within a room idea was not going to work, he said to Ribbe that "[he] had no other ideas for this deal to go through" and told him to find a new tenant. Begue confirmed that Chalk Supply was "excited about the possibility" of fire containment, but that it was ultimately determined infeasible because the allowable number of gallons under a fire containment approach was "going to be far, far too low."

Nash denied that he "just dropped the whole proceeding" with the special use permit, and contended that he "was not approved for the special use permit." He explained that there were "negotiations with [him], Mr. Ribbe, Mr. Nicolai, and Brock Hesselsweet, to try to get something in there that worked[.]" Ribbe seemed to agree, testifying that he and Nash were "certainly negotiating modifications" to the lease after it was signed in terms of the fire containment system. Nash testified that they ultimately sent floor plans prepared by Hesselsweet to Grabinski. Nicolai confirmed that Hesselsweet "did produce a floor plan," but explained that "it was never submitted for final approval" and so was never approved. Grabinski testified that, because Nicolai never approved any prints, the parties' application for a special use permit never went to the Township board, and was therefore never approved.

The parties' failure to acquire the special use permit due to their dispute about meeting the fire code ultimately led to this lawsuit. Chalk Supply filed its complaint on October 31,

-4-

2016. The complaint alleged four counts, but only Count I, alleging breach of contract, is relevant to this appeal. That count alleged that during the discussions with Muskegon Township officials, the parties were informed that "a fire suppression system would need to be installed in the warehouse area." According to the complaint, when RRE learned that the cost of such an installation would be $65,000, RRE "informed [Chalk Supply that it] would not spend the money necessary to complete the required improvements to make the property useable" for Chalk Supply. Chalk Supply contended that, due to RRE's refusal to pay for the system, Chalk Supply was never able to "use the property or move into the property under the terms of the lease." Chalk Supply alleged that this amounted to a breach of the contract by RRE because it was RRE's obligation to install fire suppression. Chalk Supply requested damages in the amount that it had prepaid in anticipation of the rental term. Chalk Supply's complaint also alleged that "[RRE] informing [Chalk Supply] that [RRE] would not incur the costs necessary for [Chalk Supply] to use the property constituted a cancellation of the contract," and that, "[d]ue to [RRE's] cancellation," RRE was "not entitled to retain any funds advanced to [it] in anticipation of the lease agreement."

In answer to Chalk Supply's Count I, RRE contended that it had agreed to pay fire suppression only if required, but it ended up not being required. RRE further contended that it only informed Chalk Supply "that 'if' a fire suppression system were 'required,' [RRE] was reticent to pay that additional cost up front." According to RRE, no fire suppression system was required, so "this post-lease notification [was] irrelevant to any issues of breach of contract." Attached to its answer, RRE also asserted a counterclaim. RRE's counterclaim alleged that Chalk Supply breached the contract and was liable for the remaining unpaid payments under the contracts.

Following a three-day bench trial, the trial court issued a written opinion and order. The trial court ruled that Ribbe's March 25 e-mail constituted an anticipatory repudiation of the parties' lease. The trial court also ruled that, following the March 25 e-mail, the parties abandoned the lease. The trial court concluded that, either way, RRE had to return the money that Chalk Supply had paid in advance of the lease, and that RRE was not entitled to relief on its counterclaim because it breached the parties' contract first.

RRE now appeals.

## II. THE FIRST BREACH RULE

RRE first argues that the trial court erred by granting summary disposition to Chalk Supply because Chalk Supply substantially breached the parties' lease before March 25, 2016, and so could not prevail on its breach of contract claim regardless of the March 25 e-mail. We disagree.

Contract interpretation presents a question of law that is reviewed de novo. *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002).

The general rule in Michigan is that the first party to breach a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform. *Flamm v Scherer*, 40 Mich App 1, 8-9; 198 NW2d 702 (1972). To apply the "first breach" rule, the

initial breach must be substantial. *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994). "To determine whether a substantial breach occurred, a trial court considers 'whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive.' " *Able Demolition, Inc v Pontiac*, 275 Mich App 577, 585; 739 NW2d 696 (2007), quoting *Holtzlander v Brownell*, 182 Mich App 716, 722; 453 NW2d 295 (1990).

RRE first argues that Chalk Supply breached Paragraph 4 of the contract. That paragraph states:

> 4. Use. Tenant shall use and occupy the Premises for warehousing, designated office and/or related purposes, and for no other purpose without Landlord's written consent, which consent can be withheld in Landlord's sole discretion. Tenant shall not conduct its business in a manner which will cause an increase in the fire and extended coverage insurance premium for the Building, and Tenant will comply with all requirements of the insurance policies relating to the Building. *Tenant shall keep the Premises and Tenant's and Tenant's agents', employees', invitees', licensees', contractors' and subcontractors' use thereof in compliance with all applicable laws, ordinances, rules and regulations. . . .* [Emphasis added.]

RRE argues that Chalk Supply failed to keep the premises in compliance with local ordinance because "Nash simply gave up" applying for the special use permit after he determined that "fire containment . . . would be impractical for his business." RRE seems to be under the mistaken impression that local ordinance required Chalk Supply to follow through obtaining the special use permit. Neither party ever submitted the local ordinance(s) they referred to at trial or are referring to on appeal, so we can only rely on the trial testimony for what local ordinance did (or did not) require. Grabinski testified that, because of the way the Geerpes building was zoned, a special use permit was required for any use of the building. Neither Grabinski nor anyone else testified that local ordinance required Chalk Supply to apply for a special use permit. Because Chalk Supply never moved into the Geerpes building (which would have required a special use permit), the local ordinance did not require Chalk Supply to have a special use permit, let alone do more to be approved for a special use permit. Thus, RRE's argument that Chalk Supply was in breach of Paragraph 4 when Ribbe sent the March 25 e-mail is without merit.

RRE next argues that by March 25, 2016, Chalk Supply was in breach of Paragraph 6, which states:

> 6. Alterations. No improvements, alterations, additions, or physical charges whose cost exceeds One Thousand Dollars ($1,000.00) shall be made upon the Premises by Tenant or Tenant's agents, employees, invitees, licensees, contractors, or subcontractors without the prior written consent of Landlord which consent may be withheld in Landlord's sole discretion. All work performed on or at the Premises by Tenant, its agents, employees, invitees, licensees, contractors, or subcontractors shall be performed in accordance with the following requirements. Tenant may only allow licensed contractors and subcontractors approved by Landlord, in writing, to perform work on or at the Premises. Tenant

shall obtain all required governmental permits and authorizations for any such work and Tenant shall cause all such work to be completed in a good and workmanlike manner, free from defective materials and in compliance with all building, zoning, and other laws, ordinances, rules, and regulations. *All improvements, alternations, additions, and physical changes to the Premises shall be completed at Tenant's sole expense and, upon the termination of this Lease, shall automatically become the property of the Landlord.* Tenant is not authorized to and shall not permit any lien to attach to Landlord's interest in the premises or the Building. [Emphasis added.]

It was undisputed at trial that RRE did work on the premises before Chalk Supply moved in—some of that work was started well before Chalk Supply even signed the contract. The parties disagreed at trial about whether Nash requested the improvements. Ribbe testified that Nash did, Nash testified that he did not.[1] Regardless of this dispute, however, the lease provision that Tenant pay for "[a]ll improvements, alterations, additions, and physical changes" follows the sentence, "All work performed on or at the Premises by Tenant, its agents, employees, invitees, licensees, contractors, or subcontractors shall be performed in accordance with the following requirements." Thus, the statement that Tenant be responsible for all alterations to the building is one of the requirements of "work performed on or at the Premises *by* Tenant, its agents, employees, invitees, licensees, contractors, or subcontractors . . ." It does not include "work performed on or at the Premises" by Landlord, nor does RRE argue that, when performing the work, RRE was Chalk Supply's agent, employee, invitee, licensee, contractor, or subcontractor.[2]

But even if Chalk Supply was to pay RRE for these improvements under the contract, the provision never states when Chalk Supply was to make that payment. Moreover, the only evidence at trial on when Chalk Supply was to make this payment supports that it was well after March 25, 2016. Ribbe testified that he never sent invoices to Chalk Supply for it to pay for

---

[1] In its opinion, the trial court stated that it found Nash to be more credible than Ribbe on factual points that they disagreed on.

[2] RRE argues in its brief that the trial court erred by denying RRE's counterclaim for the costs RRE incurred making the improvements to the Geerpes building. RRE would read the statement "[a]ll improvements, alternations, additions, and physical changes to the Premises shall be completed at Tenant's sole expense" as a standalone provision, ignoring that it follows a list of "requirements" for "[a]ll work performed on or at the Premises by Tenant, its agents, employees, invitees, licensees, contractors, or subcontractors . . . ." This is error. See *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51 n 11; 664 NW2d 776, 781 (2003) (explaining that contracts are to be read "as a whole").

The trial court concluded as much; in its opinion, it states that Paragraph 6's requirement that "[a]ll improvements . . . shall be completed at Tenant's expense" concerns "changes made *by the tenant*," and does "not address changes/alterations made *by the landlord*." RRE is thus mistaken when it states in its brief on appeal, "The trial court does concede that Ribbe would be entitled to reimbursement for alterations performed during the time the contract was in place."

RRE's work to the premises, and Nash testified that the parties' trial was the first time he ever saw the invoices from the contractors or Ribbe for the work to the Geerpes buildings. Quite simply, even if Chalk Supply was responsible for payment of the alterations under the contract and it was a breach when it did not pay for them, there is no question that this breach did not occur until well after Ribbe's March 25 e-mail.

RRE next argues that by March 25, 2016, Chalk Supply was in breach of Paragraph 16 of the lease, which states:

> 16. <u>Environmental Provisions</u>. Tenant shall not bring or permit anyone to bring any hazardous material or containment into the Building, except small quantities to be used in accordance with applicable law. . . .

RRE contends that Chalk Supply breached this provision of the contract based on Nash's admission "that he would be bringing and storing hazardous materials in the building." Chalk Supply never moved any hazardous materials into the Geerpes building, so it clearly was not in breach of this provision.

RRE next argues that Chalk Supply was in breach of Paragraph 17(b) of the lease, which states:

> 17. Insurance.
>
>       \*   \*   \*
>
> b. Beginning on the Commencement Date or Tenant's occupancy of the Premises, whichever occurs first, Tenant shall, at its expense, maintain throughout the Term of this Lease, with an insurance carrier acceptable to Landlord and having an A.M. Best rating of "A-" or better, commercial general liability insurance (including contractual liability, personal injury, broad-form property damage, extended liability, and products coverage) insuring against death and/or injuries sustained or claimed to have been sustained on or about the Premises or directly or indirectly arising out of Tenant's business in the Premises. . . .
>
>       \*   \*   \*
>
> f. Tenant's failure to provide Landlord with (i) any of the insurance policies specified herein, or (ii) proper evidence of insurance naming Landlord, its partners, agents, and employees as additional insureds shall be deemed a material breach of this lease.

RRE contends Chalk Supply breached this paragraph because Nash "admitted that he just had 'business insurance,' but he never changed the address and he never provided RRE with a copy of the certificate of insurance." RRE believes this means that, based on Paragraph 17(f), Chalk Supply "substantially breached the lease on March 15, 2016[.]" While Chalk Supply is correct that Nash testified that he had "business insurance," he also testified that he had insurance that would cover all of the requirements of the lease. He never testified that he did not have the required insurance. RRE correctly points out that Chalk Supply never provided RRE

with a certificate of insurance, and that, under Paragraph 17(f), it was required to do so and that it was an agreed upon "material breach of this lease." Fatal to RRE's argument, however, is that it reads a term into the lease that is not there. The lease does not specify *when* Chalk Supply must provide RRE with a certificate of insurance. Yet RRE clearly believes that Chalk Supply was required to give the certificate to RRE at the start of the lease, which is not stated in the lease. The language of the lease only requires that Chalk Supply have the insurance when the lease starts (March 15, 2016), not that it furnish the insurance certificate to RRE at that time. Thus, Chalk Supply's failure to provide RRE with a certificate of insurance on March 15, 2016, was not an agreed-upon material breach of the lease.

Nonetheless, RRE is correct that Chalk Supply never secured insurance for the premises. Nash testified that he did not change the address for his insurance, and this *was* required under Paragraph 17(b). But RRE does not explain how this amounted to a substantial breach, thereby abandoning the issue. *Huntington Nat'l Bank v Daniel J Aronoff Living Trust.*, 305 Mich App 496, 517; 853 NW2d 481 (2014). Moreover, Chalk Supply never moved into the Geerpes building, so it is difficult to see how RRE did not receive the benefit that it reasonably expected to from this provision. See *Able Demolition*, 275 Mich App at 585.

RRE lastly argues that, before March 25, 2016, Chalk Supply breached Paragraph 27 of the lease, which states:

> 27. <u>Security Deposit</u>. Tenant will pay to Landlord upon execution of this Lease the sum of seventy five hundred and 00/100 Dollars ($7,500.00) as security for the performance of Tenant's obligations hereunder. . . .

The lease was executed on February 19, 2016, and it is undisputed that Chalk Supply did not pay the required security deposit to RRE. RRE is therefore correct that, as of March 25, 2016, Chalk Supply was in breach of the lease. The question, then, is whether the breach was substantial. See *Michaels*, 206 Mich App at 650.

RRE fails to state why Chalk Supply's failure to pay the $7,500 security deposit amounted to a *substantial* breach, thereby abandoning this claim. *Huntington*, 305 Mich App at 517. Even addressing the issue, however, Chalk Supply's failure to pay the security deposit was not a substantial breach.

Chalk Supply prepaid 12.5 months' rent, which amounted to over $54,000. Paragraph 27 states that the security deposit was to be used "[i]n the event of a default by Tenant . . . to cure the default," and that "Tenant shall upon demand redeposit with Landlord an amount equal to that so applied so that Landlord will have the full security deposit on hand at all times during the term of this Lease." Paragraph 27 went on to state that, at the end of the lease, "Landlord will apply said deposit toward the last monthly payment." Paragraph 27 ended by stating, "Landlord will have no obligation to maintain a security deposit as a separate fund, but may commingle the deposit with Landlord's own funds." It is abundantly clear from this language that the purpose of the security deposit was so that RRE had security to cover any default by Chalk Supply. Considering that Chalk Supply paid 12.5 months' rent and had not moved onto the property, it is unclear why RRE needed another $7,500 on top of the already more than $54,000 paid by Chalk Supply to "obtain[] the benefit which [it] reasonably expected to receive" under Paragraph 27.

*Able Demolition*, 275 Mich App at 585 (quotation marks and citation omitted). Thus, Chalk Supply's failure to pay the $7,500 security deposit was clearly not a substantial breach.

## III. ANTICIPATORY BREACH

RRE alternatively argues that the record does not support the trial court's ruling that Ribbe's March 25 e-mail was an anticipatory repudiation of the parties' lease. We disagree.

A trial court's factual findings following a bench trial are reviewed for clear error and its conclusions of law are reviewed de novo. *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *Id*. at 251. Whether a breach of contract occurred is a question of fact. *City of Detroit v Porath*, 271 Mich 42, 54-55; 260 NW 114 (1935); *State-William Partnership v Gale*, 169 Mich App 170, 176; 425 NW2d 756 (1988).

As this Court has explained:

> Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance. In determining whether a repudiation occurred, it is the party's intention manifested by acts and words that is controlling, not any secret intention that may be held. [*Stoddard v Manufacturers Nat'l Bank of Grand Rapids*, 234 Mich App 140, 163; 593 NW2d 630 (1999).]

It is widely accepted that a party's statement of intention not to perform a duty under the contract except under conditions that go beyond the contract constitutes a repudiation. See Restatement (Second) of Contracts § 250 (1981), comment *b* (stating that "language that under a fair reading amounts to a statement of intention not to perform except on conditions which go beyond the contract constitutes a repudiation") (quotation marks and citation omitted); 17A Am Jur 2d Contracts § 695 ("Language that amounts to a statement of intention that one will not perform except on conditions that go beyond the contract, or unless the other party meets additional terms, constitutes a repudiation."); 17A Am Jur 2d Contracts § 696 ("To constitute an anticipatory breach based upon a request for a modification of terms, the request must be coupled with an absolute refusal to perform unless the request is granted."); Farnsworth on Contracts, 3d, § 8.21, p 562 ("A proposal of or a demand for performance on terms that go beyond the contract is not a repudiation, however, unless it is coupled with a threat of nonperformance if those terms are not accepted.").

The parties contracted on February 19, 2016. Paragraph 11 of that contract states:

> 11. <u>Fire Suppression</u>. In the event that local ordinance requires fire suppression, Tenant and Landlord agree that the installed cost of the suppression system will be divided by 84 months (7 years) of which Tenant will pay in like equal installments during the term of the lease and any renewals or extensions thereof, including prepayment at the onset of this lease term.

The parties agreed that, under this provision, RRE would pay the initial cost for fire suppression, and Chalk Supply would repay that amount over 84 months. Despite Paragraph 11, Ribbe sent the March 25 e-mail to Nash, stating:

> An update. I received a quote on fire suppression for over $65,000. As such, I wanted you to be aware that if required, we will need to review the lease tenure as I will not be willing to invest another $65k into an 18 month lease at this juncture. Frankly, I did not plan on additional doors, egress or fire, automatic closing doors and that related cost. I know your intention is to avoid the suppression, but felt to advise where I am at.

This e-mail is clear: RRE "will not be willing to invest" the amount necessary for fire suppression unless the parties reviewed "the lease tenure." That is, RRE would not pay for fire suppression unless the parties agreed to a longer lease. Ribbe's trial testimony confirmed this; he testified that the e-mail meant that if fire suppression were required, the parties would "need to review the lease" and "get this thing—thing modified," explaining that paying $65,000 "for [Chalk Supply] to have an 18 month lease [was] completely impractical," and RRE would only pay it "subject to some discussion about the tenure of the lease." This was, then, an anticipatory repudiation of the lease: Ribbe stated that RRE would not perform a duty under the contract (pay for fire suppression if required) unless Chalk Supply extended the lease (a condition that went beyond the contract).

RRE contends that his e-mail could not have been an anticipatory repudiation because it "was not unequivocal and was conditioned on the requirement of fire suppression." This argument is meritless. Under the lease, RRE was required to pay for fire suppression *if it was required*, so that Ribbe was saying that RRE would *not* pay for fire suppression if it was required was disavowing the very thing that RRE agreed to do.

RRE's more compelling argument is that its repudiation "was moot because fire suppression was indisputably <u>not</u> required." Problematically, the trial court never explicitly addressed this issue. The trial court simply concluded that the March 25 e-mail was an anticipatory repudiation without addressing whether Paragraph 11 was ever triggered. Nevertheless, based on the evidence at trial, there is no question that RRE's argument that fire suppression was *never* required is not true.

First, as already noted, no one has ever produced the local ordinances at issue, so this Court can only rely on the testimony at trial for what local ordinance did or did not require. Based on trial testimony, the local ordinance required that the parties obtain a special use permit for RRE to lease the property to Chalk Supply, and to get the special use permit, the parties' needed the approval of the fire inspector, Nicolai. Nicolai testified that local ordinance left to his discretion what would be acceptable to meet the fire code. In essence, then, whether fire suppression was required by local ordinance, or whether fire containment would work as an alternative, was left in Nicolai's discretion. Nicolai testified that fire suppression was "[i]nitially" required, and that, when the parties approached him about fire containment as a possible alternative, he permitted it. Strangely, then, local ordinance both required fire suppression, but then, without any change to the ordinance, did not require fire suppression. RRE's argument on appeal is thus based on the faulty premise that fire suppression was *never*

-11-

required. To the contrary, it *was* required, until Nicolai approved the alternative fire containment.

We conclude that implicit in the trial court's opinion is its conclusion that, when Ribbe sent the March 25 e-mail, Nicolai had not yet approved fire containment as an alternative, so fire suppression was still required by local ordinance. Thus, when Ribbe sent the March 25 e-mail, Paragraph 11 *did* apply, and RRE repudiated its duty under the lease to pay for fire suppression. Under such circumstances, there can be no doubt that following this repudiation, Chalk Supply had a cause of action for breach of contract.[3]

## IV. ABANDONMENT OF THE LEASE

RRE also argues that the record does not support the trial court's ruling that the parties abandoned the lease. We disagree.

A trial court's factual findings following a bench trial are reviewed for clear error and its conclusions of law are reviewed de novo. *Chelsea Investment Group*, 288 Mich App at, 250. A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *Id*. at 251. Whether there has been an abandonment of a contract is a matter of fact. *Dault v Schulte*, 31 Mich App 698, 701; 187 NW2d 914 (1971).

Abandonment is shown where a party "positively and absolutely refuses to perform the conditions of the contract . . . or where by his conduct he clearly shows an intention to abandon the contract." *Collins v Collins*, 348 Mich 320, 327; 83 NW2d 213 (1957) (quotation marks and citation omitted). "A contract will be treated as abandoned when acts of one party, inconsistent with the existence of the contract, are acquiesced in by the other party." *Dault*, 31 Mich App at 701 (quotation marks and citation omitted).

The trial court held that Ribbe's March 25 e-mail amounted to an abandonment of the contract. It stated, "There is no other way to interpret it"; "Ribbe clearly told Nash that he would not honor the current lease" and that "[h]e wanted a new agreement." The trial court found that "Nash clearly acquiesced to Ribbe's abandonment" because "[h]e declined to pursue enforcement of that contract and immediately shifted" to pursuing alternatives. The trial court also noted that both Nash and Begue believed that "the deal was dead."[4] The trial court also

---

[3] Moreover, at worst, the parties were unsure whether fire suppression was required, which explains why Ribbe sent the March 25 e-mail saying that RRE would not pay for fire suppression "if required." Even under that interpretation, the e-mail is an anticipatory repudiation. Parties are often unsure which portions of a contract will be triggered, and the idea of allowing a party to bring suit for an anticipatory repudiation is that the other party has explicitly stated that it will not perform on an obligation that it would be required to.

[4] RRE is correct when it points out on appeal that, when Nash was asked whether he considered "the deal done" after Ribbe's e-mail, Nash said "No." But RRE fails to acknowledge that, at other points, Nash clearly testified that he considered the deal "void" after Ribbe's e-mail. Thus,

supported its conclusion by pointing to an April 18, 2016 e-mail from Ribbe to Nash discussing the "room within a room" idea, where Ribbe "wanted a longer lease and additional compensation" for the project to go through. The trial court found, "At best, that email was an offer or an invitation to make an offer. It was certainly inconsistent with the original contract." And based on these findings, the trial court concluded that the parties abandoned the lease.

We conclude that the trial court's findings of fact were sufficient to support its legal conclusion that the parties abandoned the lease. Again, Ribbe's statement in the March 25 e-mail was a positive and absolute refusal to perform RRE's duty under Paragraph 11 of the lease. RRE's refusal to pay for fire suppression even if required was inconsistent with the terms of the lease, so RRE was acting as though it was not bound by the lease's terms. That is, RRE was acting as though there was no lease. And the trial court found that, following the e-mail, Nash believed that the deal was dead, showing that Chalk Supply acquiesced to RRE's actions and that the parties' intent was to abandon the contract.

This is not to say that there was no evidence to support that the parties had not abandoned the contract. After the March 25 e-mail, the parties continued to work together to find a way for Chalk Supply to lease the Geerpes building. The trial court could have found that these actions showed that the parties intended to follow through with the original lease. But the trial court rejected that conclusion, finding instead that the parties' actions clearly showed that their intent was for the old lease to be abandoned and for their subsequent dealings to be negotiations for a new lease. Under the clearly erroneous standard of review, we affirm these findings and conclusions.

RRE argues that the March 25 e-mail was not evidence of the parties' intent to abandon the lease because "RRE was not required under the lease to pay for fire suppression because it was not required by the Township." As already explained, this is based on a mistaken premise. Implicit in the trial court's opinion is its conclusion that, when Ribbe sent the March 25 e-mail, Nicolai had not yet approved fire containment as an alternative, so fire suppression was still required by local ordinance.

RRE provides no caselaw or other type of authority to support its other argument that "[a] party cannot abandon a contract by refusing to do something that it is not required to do in the first place." Moreover, RRE's statement that Ribbe's March 25 "email was not inconsistent [with] its obligations under the Lease" is obviously incorrect. RRE was required under Paragraph 11 to pay for fire suppression if it was required, and Ribbe's March 25 e-mail clearly stated that RRE would not pay for fire suppression if it was required.

## V. CLAIMS NOT PLEADED

For its final argument on appeal, RRE cursorily argues that the judgment "was void and should be vacated" because Chalk Supply did not plead anticipatory repudiation and

---

we are not definitely and firmly convinced that the trial court made a mistake when it found that Nash believed "the deal was dead" after the March 25 e-mail.

abandonment in its complaint. This issue was not raised in the trial court, and we therefore need not address it. *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993). Even so, briefly addressing the issue, MCR 2.118 states,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised by the pleadings. In that case, amendment of the pleadings to conform to the evidence and to raise those issues may be made on motion of a party at any time, even after judgment.

The issues of anticipatory repudiation and abandonment were clearly tried by the parties. During trial, the parties focused on the March 25 e-mail at great length, deciphering both Ribbe's intent in sending the e-mail as well as Nash's reaction to receiving the e-mail. The parties also focused at length on admitting evidence about the parties' actions following the March 25 e-mail, which the trial court relied on to support its finding of abandonment. Thus, even though the issues were not raised in the pleadings, they were tried by express or implied consent, and so "are treated as if they had been raised in the pleadings." MCR 2.118(C)(1). RRE contends that they should not be treated as having been raised in the pleadings because "Chalk [Supply] never sought to amend its Complaint to allege these theories," but RRE provides no authority for this position. By its terms, MCR 2.118(C)(1) does not require the pleading party to move to amend its pleading to conform to the evidence. And, at any rate, if RRE would have raised this issue in the lower court, the trial court could have allowed "amendment of the pleadings to conform to the evidence . . . ." MCR 2.118(C)(1). This issue does not warrant relief on appeal.

Affirmed.

/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Jonathan Tukel